UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| JAY FINKELSTEIN, derivatively on behalf of L&L Energy, Inc., | No. ~~2:11-cv-01910-RSL~~ C11-1910 RSL |
| Plaintiff, | Hon. Robert S. Lasnik |
| v. | ~~[Proposed]~~ **VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| DICKSON V. LEE, NORMAN MINETA, SHIRLEY KIANG, IAN ROBINSON, DENNIS BRACY, EDWARD L. DOWD, JR., ROBERT W. LEE, ROBERT A. OKUN, ANDREW M. LEITCH, EDMUND MOY, DR. SYD S. PENG, CLAYTON FONG, JINGCAI YANG, MOHAN DATWANI, JOSEPH BORICH, JAMES SCHAEFFER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| — and — | |
| L&L ENERGY, INC., | |
| Nominal Defendant. | |

Law Offices of
Clifford A. Cantor, P.C.
627 208th Ave. SE
Sammamish, WA 98074-7033
Tel: (425) 868-7813 · Fax: (425) 732-3752

Jay Finkelstein ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of Nominal Defendant L&L, Inc., ("L&L" or the "Company") and submits this Verified Shareholder Derivative Complaint (the "Complaint") against certain current and/or former members of its Board of Directors (the "Board" or the "Individual Defendants," and collectively with L&L, the "Defendants") on behalf of L&L seeking to remedy the Individual Defendants' breaches of their fiduciary duties from August 13, 2009 continuing to the present time (the "Relevant Period"). Plaintiff alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief based upon his attorneys' investigation, which included but was not limited to a review of United States Securities and Exchange Commission ("SEC") filings, research reports produced by Glaucus Research Group California, LLC ("Glaucus"), and GeoInvesting LLC ("GeoInvesting"), news reports, press releases, and other publicly available information regarding the Company, as follows:

## NATURE OF THE ACTION

1.      This is a derivative action brought on behalf of L&L against certain current and former members of L&L's Board of Directors for, inter alia, their breaches of fiduciary duty during the Relevant Period that have caused and will continue to cause substantial harm to the Company.

2.      Formerly known as L&L International Holdings, Inc. ("L&L Holdings"), L&L is currently engaged in the business of coal mining, clean coal washing, and coal wholesale operations based in the People's Republic of China ("China"). The Company generates revenue through a number of China-based subsidiary companies, including Kunming Biaoyu Industrial Boiler Co., Ltd. ("KMC"), L&L Coal Partners ("2 Mines"), and L&L Yunnan Tiannen Industry, Ltd. ("TNI"). Prior to January 2009, the Company had been involved mainly in air compression operations through a company named Lieurkong Machinery Co., Ltd. In January 2009, L&L disposed of its majority interest in Lieurkong Machinery Co., Ltd. purportedly in favor of focusing on the coal industry.

3.      During the Relevant Period, L&L portrayed itself as a highly successful company by announcing strong revenue growth year-over-year. Between 2010 and 2011, L&L's reported

revenues from mining, wholesale, coking, and washing increased by 23.2%, 98.9%, 112%, and 325%, respectively. L&L's stock price reflected the Company's purported success. In April 2010, the stock hit an all-time high of $14.29 per share and market capitalization of over $400 million.

4.     L&L's popularity was short-lived, however. On July 29, 2011, the Company's auditor issued an adverse opinion declaring that "[L&L] and its subsidiaries ha[d] not maintained effective internal control over financial reporting as of April 30, 2010, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)." Several days later, on August 2, 2011, Glaucus published an in-depth investigative report concluding that L&L had overstated its revenue in connection with a handful of mines and coal operations, as well as misled investors with respect to a host of past acquisitions. Specifically, contrary to L&L's SEC filings indicating that it owned, operated, and controlled certain assets, the Glaucus report produced information obtained from investigators and records from the State Administration for Industry and Commerce (the "SAIC")[1] indicating that L&L had zero interest in these assets, let alone controlling stakes. Within a week, L&L, Dickson Lee, Ian Robinson, and Rosemary Wang, the Company's Chief Executive Officer ("CEO") and two Chief Financial Officers ("CFO") during the Relevant Period, were the subject of a securities-fraud class action, *Mills et al. v. L&L Energy, Inc.*, C11-1423 RSL (W.D. Wash.).

5.     On September 19, 2013, GeoInvesting published its own investigative report which essentially updated the findings of the report released by Glaucus in August 2011. The GeoInvesting report identified mines and coal operations that L&L either did not own or from which L&L was overstating its revenue. The GeoInvesting report prompted a second securities-fraud class action, *Buker v. L&L Energy, Inc. et al.*, 1:13-CV-06704 (S.D.N.Y.), naming Dickson Lee, Ian Robinson, and Clayton Fong, the Company's CEO, CFO, and Vice President of U.S. Operations (respectively) as individual defendants. On November 18, 2013, NASDAQ halted

---

[1]     The SAIC is the Chinese government agency that regulates industry and commerce in China. It is responsible for registering new business and business licenses.

trading of L&L stock, pending an official response to an information request.

6.      As set out in the Glaucus and GeoInvesting reports and reiterated here, L&L has and is disseminating inaccurate and misleading information as to its overseas holdings and business operations.  Subsidiaries which L&L claimed to control have turned out to be owned by unrelated third parties.  Coal coking and washing facilities which L&L claimed to have generated millions of dollars of revenue have turned out to be shut down and wasting away.  Individuals from whom L&L has claimed to have purchased mines have come forward and publicly accused L&L of lying.  L&L had been maintaining two sets of financials: one grossly exaggerated set of earnings for the SEC and another substantially weaker set for the SAIC.

7.      L&L responded to the Glaucus and GeoInvesting reports and lawsuits by forming a Special Independent Committee in September 2013.  Within a month of its formation, however, the committee's chairman, Mohan Datwani, a former partner of Paul, Hastings, Kanofsky & Walker, resigned.  Datwani explained in his resignation letter and subsequent correspondence to the Company that he was left with no choice after the Company failed to keep him "fully informed as to the degree and extent of ongoing government and regulatory investigations" or "provid[e] adequate financial support to complete the [Special Independent] Committee's work, especially in connection with hiring [an] independent, qualified forensic accountant."  Datwani also called for his former co-directors to recall that it was in "the interest of all investors to have the special investigation committee provide an impartial view on allegations made against the Company based on independent investigations from professional legal and forensic accountants."

8.      L&L has experienced turnover in other critical positions.  In the years leading up to the present, L&L has faced incredible difficulty keeping a CFO and an independent auditor.  L&L's first CFO, Gene Michael Bennett, joined in March 2008.  He left roughly two months later after he was exposed for lying about his qualifications and experiences on his résumé.  (Mr. Bennett would go on to join China Agritech, Inc., which is currently embroiled in similar derivative litigation of its own.)  Nicol Leung, L&L's second CFO, began in May 2008.  She lasted roughly 13 months.  L&L's third CFO, Rosemary Wang, served as acting CFO for the

next year and a half.  L&L's fourth CFO, David Lin, joined in January 2011 and left five months

later in June 2011.  Ian Robinson, L&L's fifth CFO, was appointed in June 2011 and endures to

the present.

9. L&L encountered similar trouble holding on to an independent auditor.  Jaspers +

Hall, PC was the Company's auditor from February 2006 through October 2008, when the Public

Company Accounting Oversight Board (the "PCAOB") suspended the firm's registration.  L&L

now uses Kabani & Company, Inc., which has been the subject of two negative PCAOB

inspections.

10. L&L's improper dissemination of inaccurate and misleading information,

combined with the apparent collapse of the Special Independent Committee and selection of an

independent auditor whose qualifications are suspect, gives rise to the conclusion that the

Company and its Board of Directors were not interested in establishing and maintaining the level

of internal controls required by federal and Nevada State laws to protect the Company's outside

shareholders.

11. L&L was also apparently not interested in enforcing any controls over its

directors and managers with respect to the selling of L&L stock while in possession of material,

non-public information.  Throughout the course of the Relevant Period, defendants Dickson Lee,

Robert Lee, and Ian Robinson sold L&L shares of stock at prices that were inflated by the

inaccuracies they were simultaneously disseminating by way of the misleading financial

statements.  These defendants profited at the expense of the Company.

12. The Individual Defendants breached the fiduciary duties of candor, good faith,

fair dealing, loyalty, and due care they owed and owe to L&L by failing to prevent, and by

failing to establish and maintain internal controls which would have prevented, (i) the Company

from disseminating inaccurate statements relating to the Company's ownership of and revenue

from its coal mines, coal washing factories, and coke plants, and (ii) certain Individual

Defendants from trading L&L stock while in possession of material non-public information.

13. Consequently, L&L has been damaged and continues to be damaged.  As of

November 18, 2013, NASDAQ halted trading on L&L stock pending a formal information

request.  The Company also faces an unknown amount of investigatory and litigation costs in connection the pending securities-fraud lawsuits, including defense costs and damages judgments or settlements.  While once having a strong market capitalization of over $400 million, it has since lost roughly 85% of its value with a current capitalization of $65 million.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

15.     This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

16.     Venue is proper in this district because nominal defendant L&L maintains its principal executive offices here.

## THE PARTIES

17.     Plaintiff Finkelstein is a current shareholder of L&L and has held the Company's stock continuously from March 14, 2009 to the present.  Plaintiff is a resident and citizen of the State of Florida.

18.     Nominal defendant L&L, Inc. is a corporation organized and existing under the laws of Nevada.  L&L has its principal executive offices located at 130 Andover Park East, Suite 200, Seattle, Washington 98188.

19.     Defendant Dickson V. Lee ("Dickson Lee") founded L&L.  At all times throughout the Relevant Period, Dickson Lee was and is Chairman and CEO of L&L.  Dickson Lee is named as a defendant in both of the pending class action lawsuits.  Dickson Lee is a resident of Washington.

20.     Defendant Norman Mineta ("Mineta") was a director of L&L during the period between September 9, 2010 and August 5, 2012.  Mineta also served as the Chair of the Company's Nominations Committee.  Mineta is a resident of the District of Columbia.

21.     Defendant Shirley Kiang ("Kiang") was a director of L&L during the period between August 13, 2009 and August 5, 2009.  Kiang also served as the Chair of the Company's

Audit Committee. Kiang is a resident of Washington.

22. Defendant Ian Robinson ("Robinson") was a director of L&L during the period between August 13, 2009 and August 5, 2012. Robinson also served as the Chair of the Company's Compensation Committee and currently serves as the Company's CFO. Robinson is named as a defendant in both of the pending class action lawsuits. Robinson is a resident of Hong Kong.

23. Defendant Dennis Bracy ("Bracy") was a director of L&L during the period between November 2, 2009 and April 8, 2012. Bracy also served as a member of the Company's Audit, Nominations, Compensation, and Clean Energy Committees. Bracy is a resident of Washington.

24. Defendant Robert Lee ("Robert Lee") was a director of L&L during the period between August 13, 2009 and September 15, 2011. Defendant Robert Lee is a resident of Washington.

25. Defendant Dr. Syd S. Peng, PhD ("Peng") has been a director of L&L from June 30, 2011 to the present. He also co-leads the Company's "internal due diligence" and "acquisition and inspection" team and serves as a member of the Company's Compensation and Audit Committees. Defendant Peng is a resident of West Virginia.

26. Defendant Edward L. Dowd, Jr. ("Dowd") was a director of L&L during the period between January 12, 2010 and December 31, 2010. Dowd is a resident of Missouri.

27. Defendant Robert A. Okun ("Okun") was a director of L&L during the period between January 6, 2011 and June 30, 2011. Okun also served as a member of the Company's Audit Committee. Okun is a resident of Connecticut.

28. Defendant Andrew M. Leitch ("Leitch") was a director of L&L during the period between January 22, 2011 and June 30, 2011. Leitch also served as a member of the Company's Audit Committee. Leitch is a resident of California.

29. Defendant Edmund Moy ("Moy") was a director of L&L during the period between December 30, 2011 and August 5, 2012. Moy also served as the Company's Vice President of Corporate Infrastructure and currently sits on the Company's Advisory Board. Moy

is a resident of Washington.

30.     Defendant Clayton Fong ("Fong") was a director of L&L during the period between August 31, 2012 and August 14, 2013.  Fong also serves as the Company's Vice President of U.S. Operations.  Fong is named as a defendant in the 2013 pending class action lawsuit.  Fong is a resident of Washington.

31.     Defendant Jingcai Yang ("Yang") has been a director of L&L from April 8, 2012 to the present.  He also co-leads the Company's "internal due diligence" and "acquisition and inspection" team and serves as a member of the Company's Compensation and Audit Committees.  Yang is a resident of Beijing, China.

32.     Defendant Mohan Datwani ("Datwani") was a director of L&L during the period between August 31, 2012 and November 18, 2013.  Datwani also served as Chair of the Audit Committee and Special Independent Committee.  Datwani is a resident of Hong Kong.

33.     Defendant Joseph Borich ("Borich") has been a director of L&L from September 16, 2013 to the present.  Borich is a resident of Washington.

34.     Defendant James Schaeffer ("Schaeffer") has been a director of L&L from September 16, 2013 to the present.  Schaeffer also serves as a Director of Operations.  Schaeffer is a resident of Tennessee.

35.     The Defendants identified in paragraphs 19 to 34 are sometimes referred to collectively herein as the "Individual Defendants."  The Individual Defendants and L&L are collectively referred to herein as the "Defendants."

**FURTHER SUBSTANTIVE ALLEGATIONS**

36.     L&L, through its various subsidiaries and foreign operations, engages in coal mining, clean coal washing, coal coking, and coal wholesaling businesses in China.  Over the course of the Relevant Period, L&L purportedly operated and generated revenue from a number of mines and businesses.  The mines and businesses at issue herein are as follows: DaPuAn coal mine, SuTsong coal mine, Ping Yi coal mine, LuoZhou coal mine, LaShu coal mine, ZoneLin coke plant, KMC (subsidiary), TNI (subsidiary), and Hong Xing coal washing facility.  During the Relevant Period, L&L failed to accurately inform investors of its true ownership interests in

the coal mines and operations and the amount of revenue being generated therefrom.  L&L was able to perpetrate these inaccuracies as a result of the Company's directors' breaches of fiduciary duties and lack of internal controls serving to ensure that the Company's financial reporting was accurate, proper, and in conformance with generally accepted accounting principles in the United States ("GAAP").

**A.    L&L's Management and Directors Caused the Company to Issue Inaccurate Financial Statements**

37.    Contrary to L&L's public statements, press releases, and SEC filings (below), the Company improperly accounted for revenue from the DaPuAn coal mine, SuTsong coal mine, Ping Yi coal mine, LuoZhou coal mine, LaShu coal mine, ZoneLin coke plant, KMC subsidiary, TNI subsidiary, and Hong Xing coal washing facility.  An underlying lack of adequate internal controls throughout the Relevant Period enabled the Company to release inaccurate information concerning its overseas business operations.  Had the Company implemented sufficient internal controls or policies to ensure the accuracy of its public statements, the following errors would not have occurred.

i.    *The DaPuAn and SuTsong Coal Mines*

38.    Throughout the Relevant Period, L&L claimed to own an 80% interest in the DaPuAn and SuTsong coal mines.  However, the Glaucus report revealed that L&L in fact never owned or controlled any portion of the mines.  Official records from the SAIC indicated that the two mines remained in the possession of the family from whom L&L purportedly purchased them.

39.    Despite L&L's statement in its 2012 10-K that it recovered 129,505 tons of coal from the DuPuAn mine between January and April 2012, this mine has been reportedly shut down since November 22, 2011.

40.    Despite having no ownership interest in the DaPuAn and SuTsong coal mines (and, in the case of the DaPuAn mine, being shut down), L&L claimed revenue from the mines over the course of the Relevant Period.  This was inaccurate.

ii.    *The Ping Yi Mine*

41.     L&L purportedly acquired the Ping Yi mine in January 2010 through a subsidiary named Fuyuan County Baoxing Economic & Trade Co., Ltd.  The GeoInvesting report showed otherwise; official SAIC records indicated that the mine is owned by four individuals – Zhang Baoguo, Hu Shiwei, Liu Shuangyou, and Chen Honglin – not one of whom has any relation to L&L.  One of the Ping Yi mine owners, Hu Shiwei, even went as far as posting a video on YouTube.com in an attempt to confirm the true owner of the mine.  The video shows Hu Shiwei's official permits and ownership documents regarding the Ping Yi mine, as well as his personal affirmation that L&L has no ownership interest in the mine.[2]

42.     Due to having no ownership interest in the PingYi coal mine, the revenue L&L claimed from it during the Relevant Period was inaccurate.

                        iii.     *The DaPing Mine*

43.     Contrary to L&L's statements and SEC filings, official SAIC filings showed that L&L did not own the DaPing mine.  According to the GeoInvesting report, Chinese government officials assigned the right to consolidate the DaPing mine to an unrelated third party.

44.     L&L's claimed revenue from the DaPing mine was inaccurate.

                        iv.     *The LuoZhou and LaShu Mines*

45.     Union Energy continues to own the LuoZhou and LaShu mines, despite what L&L stated in its public filings.  Union Energy's continued ownership of the mines is supported by interviews with Union Energy management and employees, as well as articles in local newspapers and current signage.

46.     L&L's claim of revenue from the LuoZhou and LaShu mines was inaccurate.

                        v.     *The ZoneLin Coal Coking Factory*

47.     SAIC records show Defendant Dickson Lee as the sole owner of ZoneLin coking factory, purportedly acquired by L&L in 2009.  TNI purportedly purchased 100% of the ZoneLin coking factory for $2 million from Lao Zhong Yang.

48.     Further, the ZoneLin coking factory was shut down several months prior to the

---

[2]     The video is available at http://www.youtube.com/watch?v=_gJAMFCq4Ps (last checked December 5, 2013).

sale/exchange with Union Energy for the LaShu and LuoZhou mines, according to interviews with local residents, workers, and a government official.  The government-mandated decision to shut down the ZoneLin Coking Plant was first issued on June 6, 2012.  On September 10, 2012 the demolition was scheduled.

49.     Any revenue claimed by L&L in connection with the ZoneLin coking factory was inaccurate.

### vi.     *The Hong Xing Coal Washing Facility*

50.     L&L purportedly purchased the Hong Xing coal washing facility through its subsidiary TNI in November 2009.  However, SAIC filings dated April 15, 2010 show that Hong Xing is a sole proprietorship which, under Chinese law, cannot be owned by TNI.  The SAIC filings show that Hong Xing is owned by Hong Xing Li, the individual from whom L&L purportedly purchased the facility.

51.     Further, the Hong Xing coal washing facility, which purportedly generated revenue in fiscal year 2013, has been shut down since 2012.  Hong Xing did not file or pay any taxes to the Shizong County Local Tax Bureau since June 2012, and paid minimal taxes to the Bureau in the first half of 2012, according to research.

52.     L&L's claim of revenue in connection with the Hong Xing coal washing facility was inaccurate.

### vii.     *Kunming Biaoyu Industrial Boiler Ltd. (KMC)*

53.     L&L claims that during the Relevant Period it owned 100% of KMC.  To the contrary, SAIC records show that L&L owns only 60% of KMC, with the remainder owned by four minority shareholders.

54.     L&L inaccurately overstated its revenue in connection with the KMC subsidiary operations.

### viii.     *L&L Yunnan Tianneng Industry Co. Ltd. (TNI)*

55.     L&L claimed in its 2011 10-K that it owns 98% of TNI.  SAIC records show that L&L has only a 70% interest in TNI.  The remaining 30% of TNI is owned by Yunnan Tianneng Industry, which is wholly-owned by an unrelated third-party, Yunnan Xinzhongan Fire

Engineering Installation Co. Ltd.  Moreover, a January 1, 2010 acquisition agreement states that L&L owns 70% voting equity in TNI.

56.     L&L inaccurately overstated its revenue in connection with the TNI subsidiary operations.

ix.   *L&L's Reported Earnings to the SAIC*

57.     As a public company, L&L submitted its quarterly and annual financial statements to the SEC and published them to investors.  These financial statements reflected strong revenue growth.  Meanwhile, the Company submitted a second set of financial statements to the SAIC which reflected significantly weaker performance.  For instance, L&L claimed revenue of over $13 million from KMC for the period February 2008 through October 2008, while reporting to the SAIC that KMC earned only $5.6 million for the period January 2008 through December 2008.  Similarly, for the 2009 fiscal year, L&L told the SEC that it earned $13.5 million in revenue from KMC, while submitting to the SAIC that it earned nearly half that amount from KMC for the period January 2008 through December 2009 (a period twice as long).

58.     L&L's filings with the SEC and the SAIC are irreconcilable for not just its KMC operations, but also the DaPuAn and SuTsong coal mines.  Generally, during 2008 to at least 2011, L&L's SAIC filings reveal the Company's sales to be approximately one quarter of the sales represented to the SEC on its 10-K Forms.  The following table provides examples of differing revenue figures from L&L's financial statements, as reported to the SEC and the SAIC:

| L&L Operations | Reported to SEC | Reported to SAIC |
|---|---|---|
| KMC, DaPuAn, and SuTsong | $27,018,738 (Feb. 1, 2008 to Oct. 31, 2008) | $14,859,093 (Jan. 1, 2008 to Dec. 31, 2008) |
| KMC | $11,220,774 | $2,123,730 |
| DaPuAn and SuTsong | $26,168,296 (Feb. 1, 2009 to Oct. 31, 2009) | $10,409,078 (Jan. 1, 2009 to Dec. 31, 2009) |

59.     Had L&L had proper internal controls over its financial accounting, the Company would not have committed such errors in its reporting and rendered the Company vulnerable to

the negative attention it currently faces.

> x.    *L&L's Inability to Obtain an Independent Auditor*

60.    L&L has hired and fired a number of small auditing firms over the past several years.  Beginning in 2001, L&L has retained five different auditing firms: Braverman & Company, PC; Moores Rowland International; Epstein, Weber & Conover, PLC; Jaspers + Hall, PC; and Kabani & Company, Inc.  Each of these firms possess spotty track records:

- Braverman & Company, PC: Dismissed by L&L after discovering firm was not SEC-qualified

- Moores Rowland International: Resigned after auditing five months of L&L financials spanning the 2002 fiscal year; refused to sign L&L's financials; notified the SEC regarding L&L's accounting practices

- Epstein, Weber & Conover, PLC: Questioned by the PCAOB regarding policies and procedures and ability of partners to adequately supervise audit engagements

- Jaspers + Hall, PC: Registration suspended and partners barred for five years after numerous PCAOB violations

- Kabani & Company, Inc.: Investigated by the PCAOB on two occasions and former auditor for Bodisen Biotech and China Agritech.

61.    As indicated by Defendant Datwani during his resignation, the Company has faced (and continues to face) considerable difficulty retaining and keeping an independent qualified auditor.

62.    L&L approved engaging its current auditor, Kabani & Company, Inc., immediately after the suspension of Jaspers + Hall, PC.  A report written by the PCAOB indicates that the PCAOB found over 60% of the audits performed by Kabani & Company, Inc. to be suspect.  The PCAOB report described the scope of the problem stating:

> Deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements.

63.     L&L's inability to obtain and retain a competent auditor, as described by former director and Chair of the Audit Committee Defendant Datwani, has led to repeated instances of improper recognition of revenue and the dissemination of and/or failure to correct inaccurate financial information.

**B.     Materially Inaccurate Information**

      i.     _L&L's 2009 Fiscal Year – May 1, 2008 to April 30, 2009_

64.     The Company issued its Form 10-K for the 2009 fiscal year on August 13, 2009 (the "2009 10-K"). The 2009 10-K reports all aspects of L&L's business, including its corporate structure, acquisitions, and operational results.

65.     Contrary to the official SAIC records produced in connection with the GeoInvesting and Glaucus reports, L&L reported the following acquisitions in its 2009 10-K:

**Acquisitions**

. . .

As of April 30, 2009, L & L controlled 100% of KMC's equity ownership interests. In May 2008, the Company acquired controlling equity ownership interests in two operating coal mines located in Yunnan Province – the DaPuAn Mine and the SuTsong Mine.

. . .

L & L also entered two MOUs (memorandum of understanding) for the proposed acquisitions of controlling equity interests in: 1) Hon Shen's coking facilities when funds are available, and 2) Ping Yi Coal Company, with approximately 150,000 tons of annual mining production.

66.     Despite not having any ownership interest in the DaPuAn or SuTsong mines and only a 60% interest in KMC, L&L claimed substantial amounts of revenue from their facilities for its 2009 year-end earnings. L&L's 2009 10-K stated as follows:

**Results of Operations**

During the year ended on April 30, 2009, the Company coal related sales increased of approximately 75% to $40,938,128 as compared to $23,381,508 for the same year in 2008. . . .  The increase in our sales for the year ended April 30, 2009 is mainly due to our acquisition of a controlling equity interest in the 2 Mines [DuPuAn and SuTsong mines], which occurred May 2008. Our revenue of

$40,938,128 only represents revenue generated from our coal businesses and does not include the LEK revenue of approx. $9 million, as U.S. GAAP requires LEK's sales to be excluded in the Consolidated Statement of Income. . . .

As of April 30, 2009, the Company controlled 100% of KMC operations, and also controls 60% of the equity ownership of L&L Coal Partners, which, in turn, owns the 2 Mines [DuPuAn and SuTsong mines]. The Company's consolidated financial statements were prepared in accordance with the U.S. GAAP, with the Company's net profit reflecting the removal of profit attributable to the 40% minority interests belonging to the minority shareholders of L&L Coal Partners. Consequently, the Company's consolidated results of operations reflect a lower profit margin than the Company would have had if the Company controlled 100% of L&L Coal Partners equity ownership interests. To reflect its true results of operation and improve its profit, the Company intends to acquire the entire equity of L&L Coal Partners from the existing minority shareholders in the future, when it is feasible to do so.

Total Revenue:

As discussed above, the Company's revenue of $40,938,128 for the year ended April 30, 2009 excluded the revenue from LEK air compressor sales. See Note 1 and Note 21 to the Company's Financial Statements. When comparing the current year's revenue of $40,938,128 to $23,381,508 for the prior year ended April 30, 2008, the increase of $17,556,620 (or 75%) for the current year ended on April 30, 2009 was due to coal sales from the 2 Mines, in which the Company acquired a controlling equity interest in the current year and which contributed over $27 million of sales for the current year, offset by the KMC sales decrease in the year ended April 30, 2009. See Note 16, Geographic Information, below, for details.

67.   L&L further stated in its 2010 10-K that it prepared its financial reports in accordance with GAAP.  The 2010 10-K also identified the following "Significant Accounting Policies" that the Company purportedly complied with:

NOTE 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
. . .

Revenue Recognition – The Company's revenue recognition policies are in compliance with Staff accounting bulletin 104, which stipulates recognition of revenue when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of the Company exist and collectability is reasonably assured. Payments received before all of the relevant criteria for revenue recognition are satisfied are recorded as advances from customers.

68.     Significantly, L&L conceded in its 2010 10-K that Company management, along with the CEO and CFO, determined that its internal controls over financial reporting were not effective as of April 30, 2009.  Despite L&L's acknowledgement and admission of inadequate internal controls over its financial reporting, the Company made no attempt to improve its controls, stating that, "[n]o changes were made to our internal control over financial reporting that occurred during the quarter ended April 30, 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."  The 2010 10-K stated as follows:

**Item 9A. Controls and Procedures**

. . .

**Internal Control over Financial Reporting**

(a) Management's annual report on internal control over financial reporting

. . .

Based on our evaluation described above, management has concluded that our internal control over financial reporting was not effective as of April 30, 2009. Management has determined that (i) our inadequate staffing and supervision and (ii) the significant amount of manual intervention required in our accounting and financial reporting process are material weaknesses in our internal control over financial reporting.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation requirements by our registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this annual report.

(b) Changes in internal control over financial reporting

No changes were made to our internal control over financial reporting that occurred during the quarter ended April 30, 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We are aware that any system of controls, however well designed and operated, can only provide reasonable, and not absolute, assurance that the objectives of the system are met, and that maintenance of disclosure controls and

procedures and internal controls over financial reporting is an ongoing process that may change over time.

      ii.   *L&L's 2010 Fiscal Year – May 1, 2009 to April 30, 2010*

69.     The Company issued its Form 10-K for the 2010 fiscal year on July 28, 2010 (the "2010 10-K"). As in 2009, the 2010 10-K discusses all aspects of L&L's business, including its corporate structure, acquisitions, and operation results. The 2010 10-K identifies its current subsidiaries as follows:

**The Company Corporate Structure**

. . . Our coal operations consist of three coal business subsidiaries – two operating coal mines (DaPuAn Mine and SuTsong Mine with a washing facility), referred to as "2 Mines", KMC (a coal wholesale operation and PYC mine and washing facility), and TNI (coal washing and coking facilities). . . .

70.     Contrary to SAIC records revealed by the Glaucus and GeoInvesting reports, the 2010 10-K avers that L&L owns controlling interests in a number of subsidiaries and operations:

**Acquisitions**

. . . KMC conducts coal consolidation and has been in the coal wholesale business for the past fourteen years. KMC has five long term coal supplying agreements with local coal mines. In 2007, the 40% remaining equity of KMC was assigned by the minority shareholder to us. . . . In May 2008, we acquired 60% of two coal mines (DaPuAn Mine and SuTsong Mine, provisional name L&L Coal Partners, ("2 Mines") operations. On August 1, 2009, we increased our ownership of the two coal mining operations ("2 Mines"), from 60% to 80%. . . . We formed a subsidiary, TNI, in the Yunnan province, China. L&L owns 98% of the controlling interest of TNI. Through TNI, L&L acquired 100% of the equity of ZoneLin Coal Coking Factory in China ("ZoneLin") on February 3, 2010 with an effective acquisition date of November 1, 2009; and acquired 100% of the equity of SeZone County Hong Xing Coal Washing Factory ("Hong Xing") on January 1, 2010 with an effective acquisition date of November 30, 2009. KMC acquired 100% of the equity of PYC [Ping Yi coal mine] on January 18, 2010 with an effective acquisition date of November 1, 2009.

. . .

**NOTE 3. BUSINESS COMBINATIONS**

. . .

<u>Ping Yi Mine</u>

On January 18, 2010, KMC acquired 100% of the Ping Yi Coal Mine ("PYC"), with an effective date of November 1, 2009.  The purchase price of the acquisition contract is 27,042,593 RMB (equivalent to US$3,955,041) with the first payment of 23,042,593 RMB (equivalent to US $3,369,390).  The remaining balance of 4,000,000RMB (equivalent to US $585,651) will be paid in 2 years after signing the contract. In February, the Company made the second payment of 1,000,000 RMB (equivalent to US$146,412) to decrease the remaining balance to 3,000,000 RMB (equivalent to US$439,239).

. . .

<u>L&L Yunnan Tianneng Industry Co. LTD ("TNI")</u>

On January 1, 2010, the Company through its 98% owned subsidiary, TNI, acquired 100% equity of SeZone County Hong Xing Coal Washing Factory ("Hong Xing") with an effective date of November 30, 2009.  The acquisition price of 6,828,500 RMB (equivalent to US $1,000,000) was contributed by the Company to TNI.

71.     Despite that L&L had a smaller interests than its 2010 10-K portrays, the Company again claimed strong revenues from their facilities for the year.  The 2010 10-K states as follows:

**Results of Operations**

. . .

<u>Total Revenue</u>

1)     During the fiscal year ended on April 30, 2010, our revenues increased by approximately 167% to $109,217,838 as compared to $40,938,128 in 2009.  Our revenues increased over the last fiscal year were through acquisitions and organically through expansion of current operations.  Organically we increased the capacity of DaPuAn and SuTsong (2 Mines) and built a coal washing facility at our DaPuAn mine site.  We acquired Hong Xing Coal washing, Zone Lin Coking and Ping Yi Mine. These acquisitions were made in the third quarter of the fiscal year, which primarily added to the 3rd and 4th quarter numbers.

. . . The breakdown of revenue by entity of Two Mines, KMC, and TNI operations is approximately $40.6 million, $37.1 million, and $31.5 million of

sales, respectively, for the year ended April 30, 2010. . . .  During 2009, our coal related sales increased by approximately 75% to $40,938,128 as compared to $23,381,508 in 2008.  . . .  The increase in our sales for the year ended April 30, 2009 is mainly due to our acquisition of a controlling equity interest in the 2 Mines, which occurred May 2008.  Our revenue of $40,938,128 only represents revenue generated from our coal businesses and does not include the LEK revenue of approximately $9 million, as U.S. GAAP requires LEK's sales to be excluded in the Consolidated Statement of Income. LEK's net income is also reported on a separate line in the Consolidated Statement of Income.

2)     As of April 30, 2010, we controlled 100% of the KMC operations, 80% of 2 Mines, and 98% of TNI.  As of April 30, 2009, we controlled 100% of the KMC operations, and 60% of the equity ownership of 2 mines.

72.     Similar to its statements in the 2009 10-K, the 2010 10-K purports to comply with GAAP and follow the same "Significant Accounting Policies."  The 2010 10-K states as follows:

**Organization and summary of significant accounting policies**

. . .

Principles of Consolidation – The fully consolidated financial statements include the accounts of the Company, and its 100% ownership of KMC subsidiary including coal wholesale and PYC coal mine, 80% of operations of LLC "2 Mines" including both coal mining and coal washing, and 93% of HSC (disposed in year ended April 30, 2010), and 98% of TNI (coal washing and coking operations).  All significant inter-company accounts and transactions are eliminated.

. . .

Revenue Recognition – In accordance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") Topic 13, "Revenue Recognition," the Company recognizes revenue when it is realized or realizable and earned. The Company must meet all of the following four criteria under SAB 104 to recognize revenue:

- Persuasive evidence of an arrangement exists
- Delivery has occurred
- The sales price is fixed or determinable
- Collection is reasonably assured

73.     Also similar to the 2009 10-K, L&L's management once again determined the

Company's internal controls over financial reporting to be ineffective and did nothing about it. The 2010 10-K stated as follows:

**Item 9A.  Controls and Procedures**

**Evaluation of disclosure Controls and Procedures**

. . .

Our chief executive officer and acting chief financial officer evaluated the effectiveness of our disclosure controls and procedures as of April 30, 2010 and, based on this evaluation, our chief executive officer and acting chief financial officer have concluded that our disclosure controls and procedures were ineffective as of April 30, 2010.

**Management's Report on Internal Control over Financial Reporting**

. . .

Management conducted an assessment of the effectiveness of our internal control over financial reporting as of April 30, 2010.  In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control — Integrated Framework.  Based on the results of this assessment and on those criteria, management concluded that our internal control over financial reporting needs to strengthen on documentation of operations as the Company grew at a very fast pace, with four (4) material acquisitions made in the past twelve months, which requires substantial amount of documentation on internal controls of those newly acquired entities.  Despite the effort of completion of  internal control documentation in progress, the management has recruited additional professionals, including CPAs, CIA, an experienced PhD who is a quantitative operational specialist, IT professionals, and outside internal control firm to speed up documentation process, the Company is to hire additional outside consultant(s) to help complete the completion of documentation on internal controls, to make the internal controls effective.  Thus, the internal control has deficiency on documentation and was ineffective as of April 30, 2010.

The effectiveness of the Company's internal control over financial reporting as of April 30, 2010 has been audited by Kabani & Co. Inc., an independent registered public accounting firm, as stated in their report which appears herein.

**Changes in Internal Control over Financial Reporting**

During the fourth fiscal quarter, there were no changes to our internal control over financial reporting that materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

74.     The Company *amended* its 2010 10-K roughly *one year later* on July 29, 2011. As set out in the introductory explanatory note, the purpose of the amendment was in part to file "two updated reports issued by Kabani & Co. Inc., the Company's independent auditing firm . . . to disclose the firm's adverse opinion on the Company's internal control over financial reporting as of April 30, 2010 . . ." The Kabani & Co. Inc. reports stated in pertinent part as follows:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
L&L Energy, Inc. and its subsidiaries
Seattle, Washington

We have audited L&L Energy, Inc. and its subsidiaries' (the "Company") internal control over financial reporting as of April 30, 2010, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

. . .

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We have identified the following material weakness that has not been identified as a material weakness in Management's Report, included with the Company's Form 10-K filed on July 28, 2010. The Company did not maintain effective controls over its process to ensure the timely completeness and accuracy of the preparation and review of its consolidated financial statements. This resulted in several adjustments to the Company's consolidated financial statements, principally

including timely transfer of completed construction projects to property, plant and equipment, as well as reclassification of negative balances in accounts payable and accounts receivable. It was also determined that the Company's entity level controls were not adequately designed and that weaknesses were noted in the financial reporting process. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2010 financial statements, and this report does not affect our report dated July 28, 2010 on those financial statements.

In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, L&L Energy, Inc. and its subsidiaries have not maintained effective internal control over financial reporting as of April 30, 2010, based on the criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

iii.   *L&L's 2011 Fiscal Year – May 1, 2010 to April 30, 2011*

75.   The Company issued its Form 10-K for the 2011 fiscal year on July 29, 2011 (the "2011 10-K"). The 2011 10-K discusses all aspects of L&L's business, including the corporate structure, acquisitions, and operations results. The 2011 10-K describes L&L's then-current corporate structure as follows:

**Corporate Structure**

. . . Our current organizational structure is as follows (the percentages depict the current equity interests in such entities):

[Available at http://www.sec.gov/Archives/edgar/data/1137083/0001168
54211000044/form10k_v22final.htm (last checked Dec. 9, 2013).]

**NOTE 3. BUSINESS COMBINATIONS**

. . .

Ping Yi Mine

On January 18, 2010, the Company, through an indirect subsidiary, Baoxing
Economic and Trade Co., entered into an Acquisition Agreement to acquire 100%
of the Ping Yi Coal Mine ("PYC"), with an effective date of November 1, 2009,
for a purchase price of 27,042,593 RMB (equivalent to approximately
US$3,955,041). . . .

. . .

SeZone County Hong Xing Coal Washing Factory ("Hong Xing")

On January 1, 2010, the Company through its 98% owned subsidiary, L&L
Yunnan Tianneng Industry Co. LTD ("TNI"), acquired 100% of the equity of
Hong Xing . . . .

. . .

Luping County ZoneLin Coal Coking Factory in China ("Zonelin")

On February 3, 2010, the Company through its 98% owned subsidiary, TNI,
acquired 100% equity of Zonelin . . .

. . .

DaPing Coal Mine

On March 25, 2011, the Company entered into an Acquisition Agreement to acquired 60% equity of the DaPing Coal Mine ("DaPing") . . . .

76.   Without regard to L&L's true ownership of the various coal mining entities, the Company once again announced favorable earnings. The 2011 10-K stated as follows:

**Comparison of the fiscal years ended April 30, 2011 and 2010**

Our operating results during the year ended April 30, 2011 compared to the year ended April 30, 2010 reflect strong growth and, in particular, organic expansion of current operations.  In the year ended April 30, 2011, we invested in and increased the capacity of two of our current mines, DaPuAn and SuTsong (each from 150,000 tons to 300,000 tons), and we finished construction of a 600,000 ton DMS coal washing facility at Ping Yi mine site.  During the year ended April 30, 2011, we also acquired a majority interest in DaPing Mine, which added additional capacity of 300,000 tons per year.

. . .

*Coal Mining Revenue*

Total coal mining revenue increased 23.2% [$55,811,737 to $68,778,872] during the year ended April 30, 2011 compared to the year ended April 30, 2010, primarily as a result of strong organic growth. Revenue from the DaPing mine generally did not impact revenue in the year ended April 30, 2011, as the acquisition of such mine was completed late in the year.

. . .

*Wholesale Revenue*

Wholesale revenues increased by 98.9% [$16,190,761 to $32,207,744] during the year ended April 30, 2011 compared to the year ended April 30, 2010. The increase in revenue was fueled both by a large increase in average price per ton sold (up nearly $23 per ton) and a sizeable increase in year over year tonnage bought by its KMC subsidiary (50% more) and sold (almost 84,000 more tons).

. . .

*Coke Revenue*

Coking revenue for the year ended April 30, 2011 increased 112%

VERIFIED SH'HOLDER DERIV. COMPLAINT     - 24 -
No. C11-1910 RSL

[$13,380,737 to $28,420,113] compared to the year ended April 30, 2010, this was primarily attributable to revenue from our Zone Lin facility's first complete year of service, which began coking operations during the third quarter of the year ended April 30, 2010. On a prorated basis, increased average price offset a slight decrease in average tonnage sold. Management continues to be pleased with the facility's progress and plans to add to its existing 150,000 tons per year capacity in the future.

. . .

*Coal Washing Revenue*

Coal Washing revenue increased 325% [$27,285,179 to $115,835,773] in the year ended April 30, 2011 compared to the year ended April 30, 2010. This reflected an additional 600,000 tons of capacity added to its Ping Yi facility at the end of the 1st quarter of the year ended April 30, 2011. Average selling price per ton and quarterly tonnage (on a pro rata basis) both increased nominally throughout the year due to steady customer demand.

77.    L&L also confirmed that its 2011 10-K was prepared in accordance with GAAP and several other "Significant Accounting Policies." The 2011 10-K stated as follows:

**Discussion of Critical Accounting Policies and Estimates**

Our financial statements are prepared in accordance with accounting principles that are generally accepted in the United States of America ("U.S. GAAP").

. . .

Revenue Recognition – In accordance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") Topic 13, "Revenue Recognition," the Company recognizes revenue when it is realized or realizable and earned. The Company must meet all of the following four criteria under SAB 104 to recognize revenue:

- Persuasive evidence of an arrangement exists
- Delivery has occurred
- The sales price is fixed or determinable
- Collection is reasonably assured

Payments received before all of the relevant criteria for revenue recognition are satisfied are recorded as advances from customers.

. . .

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of Consolidation – The fully consolidated financial statements include the accounts of (i) the Company, (ii) its 100% ownership of KMC subsidiary including coal wholesale and PYC coal mine, (iii) 80% of operations of LLC "2 Mines" including both coal mining and coal washing, (iv) 93% of , and HSC, and 98% of TNI (coal washing and coking operations). The Company fully consolidates 100% of the assets, liabilities of its subsidiaries and shows the non-controlling interests owned by their respective owners as Non-Controlling Interests. The results of operations of our subsidiaries less amounts attributable to non-controlling interest owners are net income attributable to the Company. All inter-company accounts and transactions are eliminated.

. . .

Non-controlling Interest – In 2009, the Company purchased 60% interests in 2 Mines and subsequently increased the ownership to 80% during 2010. Certain amounts presented for prior periods previously designated as minority interest have been reclassified to conform to the current year presentation. Effective January 1, 2009, the Company adopted Financial Accounting Standards ("FASB") Accounting Standards Codification ("ASC") Topic 810, Consolidation, which established new standards governing the accounting for and reporting of non-controlling interests ("NCI") in partially owned consolidated subsidiaries and the loss of control of subsidiaries. Certain provisions of this standard indicate, among other things, that NCI (previously referred to as minority interests) be treated as a separate component of equity, not as a liability (as was previously the case), that increases and decreases in the parent's ownership interest that leave control intact be treated as equity transactions rather than as step acquisitions or dilution gains or losses, and that losses of a partially owned consolidated subsidiary be allocated to the NCI even when such allocation might result in a deficit balance. This standard also required changes to certain presentation and disclosure requirements. The provisions of the standard were applied to all NCI prospectively, except for the presentation and disclosure requirements, which were applied retrospectively to all periods presented. As a result, upon adoption, the Company retroactively reclassified the "Minority interest" balance previously included in the "Other liabilities" section of the consolidated balance sheets to a new component of equity with respect to NCI in consolidated subsidiaries. The adoption also impacted certain captions previously used on the consolidated statements of income and other comprehensive income, largely identifying net income including NCI and net income attributable to the Company.

78.    L&L's management once again evaluated its internal controls over financial reporting and, once again, concluded they were "ineffective."  The 2011 10-K stated as follows:

**Item 9A.  Controls and Procedures**

**Evaluation of disclosure Controls and Procedures**

. . .

Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures as of April 30, 2011and, based on this evaluation, have concluded that our disclosure controls and procedures were ineffective as of April 30, 2011.

**Management's Report on Internal Control over Financial Reporting**

. . .

Management conducted an assessment of the effectiveness of our internal control over financial reporting as of April 30, 2011. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework*. Based on the results of this assessment and on those criteria, management concluded that we did not maintain effective controls over the process of ensuring timely preparation of our consolidated financial statements. Additionally, we did not maintain effective controls over the process of ensuring appropriate reconciliation of several account balances, including presentation of related party balances, disaggregation of assets and liabilities on the face of the balance sheet, as well as reconciliations of cash. Lastly, we did not correctly characterize our treasury stock transaction in our statements of equity.

**Changes in Internal Control over Financial Reporting**

During the year ended April 30, 2011, we took several steps to improve our internal control function throughout the Company. These efforts have included and will continue to include the following: Recruitment of additional professionals, including CPAs, a CIA, an experienced PhD who is a quantitative operational specialist, IT professionals, and outside internal control consultants to speed up the reporting process. With respect to our successful recruitments thus far, and despite our assessed deficiencies included herein, we believe that we have made extensive improvements to our internal control processes. We intend to continue with exhausted efforts in the current fiscal year to continue to improve our internal controls and procedures.

Except as otherwise discussed herein, there have been no changes in our internal control over financial reporting during the fourth fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

iv. _L&L's 2012 Fiscal Year – May 1, 2011 to April 30, 2012_

79.     The Company issued its Form 10-K for the 2012 fiscal year on July 31, 2012 (the "2012 10-K"). The 2012 10-K discusses all aspects of L&L's business, including its corporate structure, acquisitions, and operations results. The 2012 10-K describes L&L's corporate structure as follows:

**Corporate Structure**

Our current organizational structure is as follows (the percentages depict the current equity interests in such entities):



[Available at http://www.sec.gov/Archives/edgar/data/1137083/0001137083120 00034/kllen_2012fdocx-v5.htm (last checked Dec. 9, 2013).]

. . .

**NOTE 3. BUSINESS COMBINATIONS AND DIVESTITURE**

. . .

**Acquisitions**

. . .

Ping Yi Mine

On January 18, 2010, the Company, through an indirect subsidiary, Baoxing Economic and Trade Co., entered into an Acquisition Agreement to acquire 100% of the Ping Yi Coal Mine ("PYC") . . .

. . .

VERIFIED SH'HOLDER DERIV. COMPLAINT     - 28 -
No. C11-1910 RSL

SeZone County Hong Xing Coal Washing Factory ("Hong Xing")

On January 1, 2010, the Company through its 98% owned subsidiary, L&L Yunnan Tianneng Industry Co. LTD ("TNI"), acquired 100% of the equity of Hong Xing . . .

. . .

Luping County ZoneLin Coal Coking Factory in China ("Zonelin")

On February 3, 2010, the Company through its 98% owned subsidiary, TNI, acquired 100% equity of Zonelin . . .

. . .

DaPing Coal Mine

On March 15, 2011, the Company entered into an Acquisition Agreement to acquired 60% equity of the DaPing Coal Mine ("DaPing") . . .

. . .

**Divestiture**

. . .

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine . . .

80.     For the first time during the Relevant Period, L&L did not claim outstanding year-over-year revenue.  The 2011 10-K states as follows:

**Comparison of the fiscal years ended April 30, 2012 and 2011**

. . .

*Coal Mining Revenue*

Total coal mining revenue decreased 12% [$43,175,968 to $37,902,310] for our continued operations during the year ended April 30, 2012 compared to the year ended April 30, 2011, . . . .

. . .

For the discontinued operation (Ping Yi Mine), the tons sold in FY 2012 dropped

87% [$25,602,904 to $4,332,599], coal mining revenue decreased 83%, which in turn led to a high cost of goods sold per ton and high average SG&A per ton.

. . .

    *Wholesale Revenue*

    Wholesale revenues decreased by 36% [$32,207,744 to $20,645,391] during the year ended April 30, 2012 compared to the year ended April 30, 2011.

. . .

. . .

    *Coking Revenue*

    Coking revenue for the year ended April 30, 2012 decreased 23% [$28,420,113 to $21,992,807] the average price per ton sold increased 11% and the number of Tons sold decreased 30% compared to the year ended April 30, 2011. . . .

    . . .

    *Coal Washing Revenue*

For continued operations (excluding Ping Yi washing plant), coal washing revenue increased 11% [$62,405,122 to $69,563,891] in the year ended April 30, 2012 compared to the year ended April 30, 2011. . . .

    81.    L&L confirmed its financials were prepared in accordance with GAAP and other "Significant Accounting Policies." The 2011 10-K stated as follows:

**Discussion of Critical Accounting Policies and Estimates**

    Our financial statements are prepared in accordance with accounting principles that are generally accepted in the United States of America ("U.S. GAAP"). . . .

. . .

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Principles of Consolidation – The fully consolidated financial statements include the accounts of (i) the Company, (ii) its 100% ownership of KMC subsidiary including coal wholesale, (iii) 80% of operations of LLC "2 Mines", (iv) 51% of WeiShe, (v) 98% of TaiFung and 98% of TNI (coal washing and coking operations). The Company fully consolidates 100% of the assets, liabilities of its subsidiaries and shows the non-controlling interests owned by their respective

owners as Non-Controlling Interests.  The results of operations of our subsidiaries less amounts attributable to non-controlling interest owners are net income attributable to the Company.  All inter-company accounts and transactions are eliminated.

. . .

Revenue Recognition – In accordance with the Securities and Exchange Commission's ("SEC") Staff Accounting Bulletin ("SAB") Topic 13, "Revenue Recognition," the Company recognizes revenue when it is realized or realizable and earned. The Company must meet all of the following four criteria under SAB 104 to recognize revenue:

- Persuasive evidence of an arrangement exists
- Delivery has occurred
- The sales price is fixed or determinable
- Collection is reasonably assured

Payments received before all of the relevant criteria for revenue recognition are satisfied are recorded as advances from customers.

. . .

Non-controlling Interest - Non-controlling interest represents the portion of equity that is not attributable to the Company. The net income (loss) attributable to noncontrolling interests are separately presented in the accompanying statements of income and other comprehensive income. Losses attributable to noncontrolling interests in a subsidiary may exceed the interest in the subsidiary's equity. The related noncontrolling interest continue to be attributed its share of losses even if that attribution results in a deficit of the noncontrolling interest balance.

82.    L&L's 2011 10-K once again indicated that its internal controls over financial accounting were ineffective.  First, the 2011 10-K contained the same statement regarding management's evaluation that controls were ineffective that had been made in prior years:

**Item 9A.  Controls and Procedures**

**Evaluation of disclosure Controls and Procedures**

. . .

Our chief executive officer and chief financial officer evaluated the effectiveness of our disclosure controls and procedures as of April 30, 2012 and,

based on this evaluation, have concluded that our disclosure controls and procedures were ineffective as of April 30, 2012.

**Management's Report on Internal Control over Financial Reporting**

. . .

Management conducted an assessment of the effectiveness of our internal control over financial reporting as of April 30, 2012. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework*. Based on the results of this assessment and on those criteria, management concluded that we did not maintain effective controls over the process of ensuring timely preparation of our consolidated financial statements. Additionally, we did not maintain effective controls over presentation and calculation of notes receivable result from the disposition of PingYi mine in the current year.

83.     Next, the 2011 10-K described the several steps L&L made to improve its internal controls:

**Changes in Internal Control over Financial Reporting**

During the year ended April 30, 2012, we took several steps to improve our internal control function throughout the Company. These efforts have included and will continue to include the following: Recruitment of additional professionals, including CPAs, a CIA, an experienced PhD who is a quantitative operational specialist, IT professionals, and outside internal control consultants to speed up the reporting process. With respect to our successful recruitments thus far, and despite our assessed deficiencies included herein, we believe that we have made extensive improvements to our internal control processes. We intend to continue with exhausted efforts in the current fiscal year to continue to improve our internal controls and procedures.

Except as otherwise discussed herein, there have been no changes in our internal control over financial reporting during the fourth fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

84.     Finally, the 2011 10-K included another report from the Company's independent auditing firm in which it identified another "material weakness" in L&L's internal controls.  The report read as follows:

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 32 -
No. C11-1910 RSL

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
L&L Energy, Inc. and its subsidiaries
Seattle, Washington

We have audited L&L Energy, Inc. and its subsidiaries' (the "Company") internal control over financial reporting as of April 30, 2012, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Report of Management on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

. . .

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment. The Company did not maintain effective controls over the process of ensuring timely preparation of its consolidated financial statements to allow for sufficient review prior to its filing deadline. Additionally, the Company did not maintain effective controls over presentation and calculation of notes receivable resultant from the disposition of the Ping Yi mine in the current year. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2012 consolidated financial statements, and this report does not affect our report dated July 31, 2012 on those consolidated financial statements.

In our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, L&L Energy, Inc. and its subsidiaries has not maintained effective internal control over financial reporting as of April 30, 2012, based on criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

      v.     *L&L's 2013 Fiscal Year – May 1, 2012 to April 30, 2013*

85.     The Company issued its Form 10-K for the 2013 fiscal year on July 30, 2013 (the "2013 10-K"). The 2013 10-K discusses all aspects of L&L's business, including L&L's corporate structure, acquisitions, and operations results. The 2013 10-K describes L&L's current corporate structure as follows:

**Corporate Structure**

. . . Our current organizational structure is as follows (the percentages depict the current equity interests in such entities):



[Available at http://www.sec.gov/Archives/edgar/data/1137083/ 000113708313000025/k-2013llen.htm (last checked Dec. 9, 2013).]

. . .

**NOTE 3. BUSINESS COMBINATIONS AND DIVESTITURE**

**Acquisitions**

. . .

DaPing Coal Mine

On March 25, 2011, the Company entered into an Acquisition Agreement with Mr. Hobin, a Chinese Citizen ("Seller") to acquire 60% equity interest of the DaPing Coal Mine ("Da Ping"), for a purchase price of US$17,064,815 (RMB 112,080,000 ). . . .

. . .

On November 18, 2012, the Company divested the Da Ping mine as part of consideration paid in the acquisition of LuoZhou and LaShu.coal mines.

. . .

LaShu ("LaShu") and Luozhou ("LuoZhou") Coal Mine:

On November 18, 2012, the Company entered into an Equity Ownership Transfer Agreement (the "Agreement") with Union Energy, and Union Capital to purchase 95% of the equity ownership interest of both LuoZhou and LaShu Coal Mine.

. . .

**Divestiture**

. . .

Sale of Ping Yi Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the Ping Yi Mine. On April 30, 2012, the Company entered into an Equity Sale and Purchase Agreement with Mr. Zhang, the previous owner of Ping Yi Mine, whereby the company sold its 100% equity ownership interest in Ping Yi Mine . . .

. . .

Sale of DaPing Coal Mine

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the DaPing Mine. On November 18, 2012, the Company decided to purchase two coal mines, which are LuoZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. . . .

Sale of ZoneLin Coking Plant

With consideration of several factors including continuing development strategies, the Company made the determination to dispose of the ZoneLin Coking Plant. On November 18, 2012, the Company decided to purchase two coal mines, which are LouZhou and LaShu mines by making a swap of the 60% equity interest in DaPing mine and 98% equity interest in ZoneLin Coking Plant. . . .

86.     The Company reported strong earnings, irrespective of its true ownership interests in the various mines and operations.  The 2013 10-K stated as follows:

**Comparison of the fiscal years ended April 30, 2013 and 2012**

Our operating results during the year ended April 30, 2013 compared to the

year ended April 30, 2012 reflect a substantial  increase resulting from all of our
five mines producing at or near full capacity and an addition of two new mines
that were able to ramp up their coal production over the course of the fiscal year.

. . .

### Coal Mining Revenue

Total coal mining revenue increased  158% [$29,378,677 to $ 75,689,661]
for our continued operations during the year ended April 30, 2013 compared to
the year ended April 30, 2012, primarily as a result of full capacity production in
all of our five mines, of which two were new acquisitions during our third quarter.

. . .

### Wholesale Revenue

Wholesale revenues increased by 121% [$20,645,391 to $45,662,814]
during the year ended April 30, 2013 compared to the year ended April 30, 2012.
Although the average price per ton sold decreased 37%, the number of tons sold
increased 250% during the same period. The substantial increase in revenue was
fueled by introduction of large customers such as Datang.

. . .

### Coking Revenue

Coking revenue for the year ended April 30, 2013 decreased 69%
[$22,093,798 to $6,746,558] as compared with FY 2012. The average price per
ton sold decreased by 4% and the number of tons sold decreased 68% compared
to the year ended April 30, 2012. The decrease in both revenue and volume was a
result of the sale of ZoneLin Coking Plant on November 18, 2012. The average
price was relatively stable.

. . .

### Coal Washing Revenue

Coal washing revenue increased 23% [$62,916,415 to $77,630,192] in the
year ended April 30, 2013 compared to the year ended April 30, 2012. This was
result of increased overall raw coal demand despite our disposal of the Ping Yi
Mine and washing facility. The average price per ton sold increased by 8%, while
number of the tons sold increased by 18% because we secured additional key
customers in the year ended April 30, 2013 compared to the year ended April 30,
2012.

87.     L&L again asserted that its financial reports were prepared in accordance with

GAAP and other "Significant Accounting Policies."  The 2013 10-K stated as follows:

**Discussion of Critical Accounting Policies and Estimates**

Our financial statements are prepared in accordance with accounting principles that are generally accepted in the United States of America ("U.S. GAAP").  . . .

. . .

*Revenue Recognition* – In accordance with the Securities and Exchange Commission's ("**SEC**") Staff Accounting Bulletin ("SAB") Topic 13, "Revenue Recognition," the Company recognizes revenue when it is realized or realizable and earned. The Company must meet all of the following four criteria under SAB 104 to recognize revenue:

- Persuasive evidence of an arrangement exists
- Delivery has occurred
- The sales price is fixed or determinable
- Collection is reasonably assured

In general, according to SAB 104, the Company recognizes the revenue when shipping occurs, which customarily occurs when our customers come with their own trucks to pick up coal.  Four criteria must be met prior to the Company recognizing the revenue, persuasive evidence of an arrangement, delivery has occurred, sales prices is fixed or determinable and collection is reasonably assured.  There was no difference among segments in term of revenue recognition.

Payments received before all of the relevant criteria for revenue recognition are satisfied are recorded as advances from customers.

. . .

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Principles of Consolidation – The fully consolidated financial statements include the accounts of (i) the Company, (ii) its 100% ownership of KMC subsidiary including coal wholesale, (iii) 80% of operations of LLC "2 Mines", (iv) 51% of WeiShe, (v) 98% of TaiFung and 98% of TNI (coal washing and coking operations and (vi) 95% of both LaShu and LuoZhou mines. The Company fully consolidates 100% of the assets and liabilities of its subsidiaries and shows the

non-controlling interests owned by their respective owners as Non-Controlling Interests. The results of operations of our subsidiaries less amounts attributable to non-controlling interest owners are net income attributable to the Company. All inter-company accounts and transactions are eliminated.

Use of Estimates – The preparation of financial statements, in conformity with accounting principles generally accepted in the United States of America, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base these estimates on historical and anticipated results and trends and on various other assumptions that we believe are reasonable under the circumstances, including assumptions as to future events. These estimates form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. By their nature, estimates are subject to an inherent degree of uncertainty. Actual results may differ from management's estimates.

. . .

Non-controlling Interest – Non-controlling interest represents the portion of equity that is not attributable to the Company. The net income (loss) attributable to non-controlling interests are separately presented in the accompanying statements of income and other comprehensive income. Losses attributable to non-controlling interests in a subsidiary may exceed the interest in the subsidiary's equity.  The related non-controlling interest continues to be attributed its share of losses even if that attribution results in a deficit of the non-controlling interest balance.

88.    For the first time during the Relevant Period, management concluded that the Company's internal controls over financial reporting were effective.  The 2013 10-K stated as follows:

**Item 9A. Controls and Procedures**

**(a) Evaluation of Disclosure Controls and Procedures**

. . .

We have evaluated, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as of the end of

the fiscal year covered by this annual report.  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were effective at the reasonable assurance level, as of the fiscal year-end covered by this Annual Report on Form 10-K.

**(b) Management's Report of Internal Control Over Financial Reporting**

. . .

Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of the end of the fiscal year covered by this report based on the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework.  Based on this evaluation, management concluded that the Company's internal controls over financial reporting were effective at the reasonable assurance level as of the fiscal year-end covered by this Annual Report on Form 10-K.

Kabani & Company, Inc., the Company's independent registered public accounting firm, has issued an attestation report on the Company's internal control over financial reporting as included elsewhere herein.

**(c) Changes in Internal Controls over Financial Reporting**

We have engaged third party consultants and have increased and formalized internal review procedures in an effort to ensure that our consolidated financial statements accurately reflect our financial condition and results of operations.

89.     L&L's annual financial statements and 10-K reports to the SEC for the fiscal years 2009 through 2013 each contained materially inaccurate information concerning the Company's revenue from its various coal operations and subsidiaries.  Furthermore, the Company apparently needed four years to bring the internal controls over its financial reporting up to a level where L&L's own CEO and CFO could regard them as "effective."  Had the Individual Defendants implemented and maintained a set of effective internal controls when it first found them deficient in 2009, this Company may very well have avoided the trouble it currently faces.

### C.     Damage to L&L

90.     During the Relevant Period, L&L's stock price has dropped dramatically from its high of $14.29 on April 6, 2010 to $1.68 on November 15, 2013, the last day the stock traded before NASDAQ halted trading on November 18, 2013.

91.     The Company presently faces not one but two securities-fraud class actions: *Mills v. L&L Energy, Inc., et al.*, C11-1423 RSL (W.D. Wash.) and *Buker v. L&L Energy, Inc., et al.*, 1:13-cv-06704-RA (S.D.N.Y.).  These lawsuits will necessitate the Company incurring wasteful costs and risks, including but not limited to investigation costs, additional director compensation stemming from the formation of special independent committees, legal fees, and money that may be paid in connection with liability judgments or settlements.

92.     Throughout the Relevant Period, each of the Individual Defendants contributed to the L&L's dissemination of materially inaccurate information.  Pursuant to GAAP, Financial Accounting Standard 94, Financial Accounting Bulletin 160, and other accounting rules, L&L was not permitted to consolidate revenue from the DaPuAn coal mine, SuTsong coal mine, Ping Yi coal mine, LuoZhou coal mine, LaShu coal mine, ZoneLin coke plant, KMC, TNI, and Hong Xing coal washing facility.  The Individual Defendants were aware that L&L did not hold majority interests in these assets, yet failed to prevent the Company from acting as if it did.

93.     The Individual Defendants permitted L&L to perpetuate these material inaccuracies year after year by failing to implement effective internal controls capable of stopping L&L's management from placing L&L in harm's way.  Despite recognizing that the Company's internal controls over financial reporting were "ineffective," the Individual Defendants failed to take any action until it was too late.  The Individual Defendants' actions amount to breaches of fiduciary duty, among other things.

### INSIDER TRADING AND UNJUST ENRICHMENT ALLEGATIONS

94.     As a result of the Individual Defendants' positions with L&L throughout the Relevant Period, each knew and had access to non-public material information about the Company's business and its claimed equity interests in the DaPuAn coal mine, SuTsong coal mine, Ping Yi coal mine, LuoZhou coal mine, LaShu coal mine, ZoneLin coke plant, KMC, TNI,

and Hong Xing coal washing facility.  Given their access to this information, the Individual

Defendants had a duty to either refrain from trading on the information or disclose the

information to the general public.  Certain Individual Defendants did neither.

95.     Certain Individual Defendants traded on material non-public information

throughout the Relevant Period as follows:

**Dickson Lee**

| Action | Date | Amount | Proceeds/(Cost) |
|--------|------|--------|-----------------|
| Donation | 9/30/09 | 400,000 | $2,300,000 |
| Donation | 4/27/10 | 200,000 | $2,384,000 |
| Buy | 4/29/10 | 24,000 | ($54,000) |
| Buy | 4/30/10 | 108,860 | ($276,000) |
| Buy | 6/2/10 | 12,000 | ($102,708) |
| Buy | 7/1/10 | 200,000 | ($507,000) |
| Buy | 8/25/10 | 54,000 | ($157,500) |
| Buy | 9/15/10 | 138,711 | ($1,011,203) |
| Donation | 12/16/10 | 200,000 | ($2,202,000) |
| Sell | 1/19/11 | 36,806 | $287,087 |
| Sell | 1/20/11 | 179,000 | $1,353,240 |
| Sell | 1/21/11 | 3,000 | $23,190 |
| Buy | 4/6/11 | 1,600 | ($9,483) |
| Buy | 8/29/11 | 49,411 | ($419,994) |
| Buy | 9/22/11 | 4,800 | ($13,293) |
| Buy | 10/28/11 | 26,250 | ($105,000) |
| Sell | 10/31/12 | 750,447 | $1,598,452 |
| Buy | 4/30/13 | 28,571 | ($49,999) |
| Buy | 9/24/13 | 200,000 | ($218,000) |

**Ian Robinson**

| Action | Date | Amount | Proceeds/(Cost) |
|--------|------|--------|-----------------|
| Buy | 5/14/10 | 1,944 | ($9,000) |
| Sell | 6/2/10 | 12,000 | $102,708 |
| Buy | 9/15/10 | 35,000 | ($105,000) |
| Buy | 12/2/10 | 875 | ($8,001) |
| Buy | 1/31/11 | 404 | ($4,003) |
| Buy | 5/2/11 | 551 | ($4,000) |
| Buy | 8/1/11 | 646 | ($3,669) |
| Buy | 11/1/11 | 971 | ($3,000) |
| Buy | 7/2/12 | 32,175 | ($57,271) |
| Sell | 10/8/12 | 72,566 | $124,813 |
| Buy | 8/21/13 | 33,333 | ($73,332) |

**Robert Lee**

| Action | Date | Amount | Proceeds/(Cost) |
|--------|------|--------|-----------------|
| Buy | 9/3/10 | 57,750 | ($173,250) |
| Buy | 12/2/10 | 656 | ($5,999) |
| Sell | 12/3/10 | 80,000 | $985,600 |
| Sell | 1/6/11 | 100,000 | $1,048,000 |
| Buy | 1/31/11 | 303 | ($3,003) |
| Buy | 4/30/11 | 52,320 | ($156,960) |
| Buy | 5/2/11 | 413 | ($2,998) |
| Buy | 8/1/11 | 529 | ($3,005) |
| Buy | 11/1/11 | 971 | ($3,000) |
| Buy | 12/30/11 | 705 | ($2,002) |

96.     These trades were unusual in timing and amount. In addition, these trades amounted to material percentages of the particular defendants' stock ownership.  For example, Dickson Lee reaped a substantial tax benefit from his $7 million donation of stock.  Robert Lee meanwhile netted sales of approximately $1.7 million.  In both instances, neither defendant had sold any stock prior to their respective dispositions.

97.     Defendants Dickson Lee, Peng, Fong, and Bracy also received stock options during the course of the Relevant Period.  On March 5, 2011, Bracy received 40,000 options with an exercise price at $7.65 per unit.  On August 31, 2012, Dickson Lee, Peng, and Fong received 80,000 options each with an exercise price at $2.00 per unit.

98.     The value of a stock option is tied to a company's stock price.  The greater the stock price relative to the option exercise price, the more valuable the option.

99.     By failing to implement controls that could have prevented such insider trading and/or disseminated accurate financial information, these Individual Defendants unjustly enriched themselves through the value of their stock options.

100.    The Individual Defendants were L&L's top executives and directors.  These defendants developed, executed, and supervised L&L's business strategy.  L&L's success depended on the aggressive acquisitions and increased revenues that investors had come to expect.  To accomplish this, L&L declined to implement internal controls to prevent the dissemination of inaccurate material information and/or proceeded without such controls so as to

render the Company unable to prevent the dissemination of the inaccurate information.

101.     All the while, certain Individual Defendants profited from the apparent growth of the Company by trading on material nonpublic information or receiving and/or exercising stock options with unrealistic exercise prices.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

102.     Plaintiff brings this action derivatively in the right and for the benefit of L&L to redress injuries suffered and to be suffered by L&L as a direct result of breaches of fiduciary duty, unjust enrichment, and insider trading by the Individual Defendants.  L&L is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that the Court would not otherwise have.

103.     L&L's current Board of Directors consists of the following five Individual Defendants: Dickson Lee, Joseph Borich, James Schaeffer, Dr. Syd S. Peng, and Jingcai Yang.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and a useless act, as set forth below.

    **A.     The Board Is Not Disinterested and Independent**

104.     Defendant Dickson Lee is the CEO of L&L.  Dickson Lee received (or accrued) $130,000 in connection with his position as Chairman of the L&L Board of Directors and an additional $400,000 in connection with his position as Chief Executive Officer.  Dickson Lee's compensation is material and renders him incapable of taking any action that would jeopardize his source of income or position with the Company.  Additionally, given that Dickson Lee is named as a defendant in both of the pending class action lawsuits, any findings made by an investigation would potentially incriminate Dickson Lee or lead to civil liability.  Consequently, Dickson Lee is unable to exercise independent judgment.  Demand on Dickson Lee would be futile.

105.     Defendant Schaeffer is a non-independent director, according to L&L's Form 8-K filed August 14, 2013, which confirms that L&L nominated Schaeffer as a "non independent board member for election during the Company's Annual General Shareholders' Meeting on September 16, 2013." On August 19, 2013, L&L released a "Strategic Update" confirming that

Defendant Schaeffer would be joining L&L's management team as a "Director of Operations, helping the Company evaluate new energy opportunities in the [United States] . . ." Defendant Schaeffer was elected to L&L's Board of Directors on September 16, 2013, and currently serves in a management role as Director of Operations. Schaeffer's employee compensation, director compensation, and current employment with the Company prevent him from asserting independent judgment. Demand on Schaeffer would be futile.

106. Defendants Peng and Yang led L&L's "internal due diligence team," according to L&L press releases. The "internal due diligence team," also referred to as the "inspection and acquisition team," identifies and vets mines and coal operations for acquisition. In connection with their roles on the "internal due diligence team," Peng and Yang were instrumental in L&L's purported acquisition of the LuoZhou and LaShu mines during the course of the 2013 fiscal year. Peng's involvement with the "inspection and acquisition team" dates back to as early as L&L's second quarter of FYE 2012. As indicated in L&L's 2012 10-K, "[L&L's] inspection team, suggests strategies [sic] by Dr. Syd Peng, was in China at the end of our second fiscal quarter and the start of our fourth fiscal quarter to inspect, assess, and supervise the acquisitions. Dr. Peng and the inspection team have physically inspected a significant number of potential mines for acquisition and have recommended the Company pursue the acquisition of several of mines. Our teams are currently focused on extensive due diligence of these potential acquisitions in preparation for upcoming negotiations." As stated by L&L in its 2013 proxy statement, "Dr. Peng has played a crucial role in assessing and valuing the Company's current assets and future acquisitions." Defendant Peng and Yang's personal involvement with the acquisitions at issue herein render them conflicted in terms of pursuing an investigation, as any investigation into why or how the various assets may establish wrongdoing on the part of Peng and Yang. Demand on either of them would be futile.

107. In addition to Peng and Yang's personal involvement with the acquisition and inspection of a number of the mines and coal operations at issue herein, both Peng and Yang received substantial material compensation in exchange for their director and employee services. During the 2013 fiscal year, Peng received a total of $161,808 in compensation: 80,000 stock

options valued at $85,141 at the time of the grant; $10,667 fees earned or paid in cash; and $66,000 in stock awards. Peng, who is employed by West Virginia University, received annual compensation for 2012 in the amount of $110,022. Yang received $127,143 in total director compensation during the 2013 fiscal year. Given Peng and Yang's material and substantial director compensation, they are conflicted from taking any action that might jeopardize their respective sources of income and therefore cannot exercise independent judgment. Demand on Peng and Yang would be futile.

108. Joseph Borich was the President of the "Washington State China Relations Council" (the "WSCRC") for roughly 16 years until resigning in late October 2013. L&L describes the WSCRC on its website as a "nonprofit organization representing over 100 corporate members including Boeing, Microsoft, Costco, PACCAR and Starbucks." According to the WSCRC's IRS Form 990 for the year 2009, 2010, and 2011, Mr. Borich was the only officer, director, trustee, or key employee. The WSCRC paid Mr. Borich a salary of $80,000 per year in exchange for the 40 hours of work per week he devotes in the course of his position as "Executive Director." Following his resignation from the WSCRC, Borich claimed he would "do some consulting" with "Bill Stafford." Bill Stafford Consulting is a small consulting agency located in Seattle, Washington, founded in 2011. Annual revenue for the agency is listed as "under $500,000." Borich retained his seat on the Board of Directors of L&L, along with his director compensation package of $80,000 per year. For serving on L&L's Board of Directors in the fiscal year 2013, Borich received the standard $80,000 plus a one-time increase of $50,000. Borich's director compensation meets (and may even exceed) the compensation he received from his "full time job" at the WSCRC and/or his present position at Bill Stafford Consulting. Consequently, Borich would not be able to take any action that might jeopardize his source of income from the Company, and therefore cannot exercise independent judgment. Demand on Borich would be futile.

109. Until recently, Defendant Datwani held the sixth seat on L&L's Board of Directors and served as the chairman of both the Audit and Special Independent Committees and a member of both the Nominations and Compensation Committees. Datwani joined L&L as an

advisor in 2011.  Prior to joining L&L, Datwani was a Partner with the international law firm of Paul, Hastings, Janofsky & Walker.  On November 18, 2013, the Company filed a Form 8-K indicating that Defendant Datwani "tendered his resignation from his position as a member of the Board of Directors of [L&L] 'due to recent developments with the Company.'"  Defendant Datwani, who served as the chairman of both the Audit and Special Independent Committees and a member of both the Nominations and Compensation Committees, explained that his resignation was in part due to his belief that "the Company had not kept [him] fully informed as to the degree and extent of ongoing government and regulatory investigations" and that "the Company did not provid[e] adequate financial support to complete the [Special Independent] Committee's work, especially in connection with hiring [an] independent, qualified forensic accountant."  Defendant Datwani, in subsequent correspondence with the Company, affirmed his reasons for resignation in response to the Company's "characterization[s]."  Defendant Datwani also called for the remaining directors and managers of the Company to "align themselves" with respect to the belief that it would be "in the interest of all investors to have the special investigation committee provide an impartial view on allegations made against the Company based on independent investigations from professional legal and forensic accountants."

110.    Given Datwani's own inability to obtain compliance from the Board of Directors, it stands to reason that any demand from Plaintiff would be met with the same, or even less, cooperation.  Demand on the remaining board members would be futile.

**B.    The Board Faces a Substantial Likelihood of Liability**

111.    Defendants Yang and Peng are members of the Audit Committee.  As members of the Audit Committee, these defendants had the responsibility to review the Company's interim financial statements, earnings, press releases, and its earnings guidance.  According to L&L's Charter of the Audit Committee of the Board of Directors, the Audit Committee must "assist the Board in: 1) monitoring the quality, reliability and integrity of the accounting policies and financial statements of the Company; 2) overseeing the Company's compliance with legal and regulatory requirements; 3) reviewing the independence, qualifications and performance of the Company's internal and external auditors; 4) overseeing the performance of the Company's

internal audit function and independent auditors; and 5) preparing an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement." Additionally, the Audit Committee is charged with complete oversight of the independent auditor, discuss and review the preparation and integrity of the Company's financial reporting and SEC Filings, and adopt a Code of Business Ethics and review transactions between the Company and "related persons." Thus, Yang and Peng were responsible for causing/enabling the Company to issue a series of materially inaccurate statements regarding the financial condition and business prospects of the Company, and issuing inaccurate guidance. Accordingly, the Audit Committee defendants face a substantial likelihood of liability for their breach of fiduciary duties. Demand upon them is futile.

112. Defendants Dickson Lee, Peng, Yang, Schaeffer, and Borich were bound by L&L's Code of Conduct and Ethics (the "Code") at all times during the Relevant Period. The Code required: 1) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; 2) full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company; 3) compliance with applicable U.S. Government laws, rules and regulations; 4) timely internal reporting of violations of this Code of Ethics and Code of Business Conduct to an appropriate person or persons identified in this Code of Ethics and Business Conduct; and 5) accountability for adherence to this Code of Ethics and Business Conduct.

113. Each and every Individual Defendant breached the Code and, in doing so, breached their fiduciary duties to the Company, by enabling and/or failing to institute controls that would prevent the Company's issuance of materially inaccurate statements regarding L&L's growth prospects and current financial situation.

114. The Individual Defendants reviewed, prepared, and/or signed and were collectively responsible for, the materially inaccurate press releases and financial statements during the Relevant Period. These Individual Defendants owed a duty to L&L and its shareholders to be reasonably informed about business and operations of the Company. The

Individual Defendants breached their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

115.    These acts were not, nor could they have been, the product of a valid or good faith exercise of business judgment.  Demand is excused because the damage to the Company alleged herein is a direct result of the Board's failure to implement internal controls and oversee and manage the Company.  Accordingly, the Board cannot exercise independent objective judgment in deciding whether to bring this action because its members are personally interested in the outcome of this lawsuit as it is their actions that have subjected L&L (and possibly themselves) to liability.

116.    If the Individual Defendants are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by the Individual Defendants' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds—i.e. monies belonging to the stockholders of L&L.  However, the Individual Defendant's liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by L&L against the Individual Defendants, known as the "insured versus insured exclusion".  As a result, if these Individual Defendants were to cause L&L to sue themselves or certain members of the Individual Defendants of L&L, there would be no directors' insurance protection and thus it is not reasonable to expect they will bring such a suit.  If the suit is brought derivatively, as this action is, such coverage exists and will provide a basis for the Company to effectuate recovery. If there is no director's liability insurance, then the Individual Defendants will not cause L&L to sue the Individual Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

117.    For all of the reasons expressed in this Complaint, making a pre-suit demand on the Board would be futile and is therefore excused.

### Count I

### Breach of fiduciary duties for failing to install internal controls
### and failing to properly oversee and manage the Company

**(against all individual defendants)**

118.    Plaintiff repeats and realleges each and every allegation contained above, except ¶¶ 96-98 and 101, as if fully set forth herein.

119.    The Individual Defendants owed and owe to L&L fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and continue to owe L&L the highest obligations of candor, care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

120.    The Individual Defendants, individually and collectively, violated and breached these fiduciary duties.

121.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, L&L has sustained substantial damages, not only monetarily but also to its corporate image and goodwill.

122.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of L&L, has no adequate remedy at law.

**Count II**

**Unjust enrichment**

**(against all individual defendants)**

124.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of L&L.

126.    Plaintiff, as a shareholder and representative of L&L, seeks restitution from the Individual Defendants and each of them and seeks an order of this Court that they disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and breaches of their fiduciary duties.

**Count III**

**Insider Trading**

**(against Dickson Lee, Robert Lee, and Ian Robinson)**

127.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

128.     By reason of their positions as directors and/or officers of L&L, at the time the defendants sold their L&L shares, each had access to and knew material non-public information regarding L&L, and knew or should have known that the public disclosure of this information would adversely affect the market price of L&L stock.

129.     In selling their L&L stock, as set forth above, the defendants used L&L's material non-public information for personal gain, in breach of their fiduciary duties to L&L and its shareholders.

130.     By reason of the aforesaid insider sales, the Defendants profited through their fiduciary positions.

131.     Defendants are obliged to disgorge these unlawful profits for the benefit of L&L.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of L&L, prays for relief and judgment as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Against all Individual Defendants and in favor of the Company for an amount equal to all compensation, including benefits, paid to the Individual Defendants during the period of their breaches of fiduciary duties;

C.     Directing Defendants to take all necessary actions to reform and improve L&L's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including but not limited to putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding to L&L restitution from the Individual Defendants and each of them and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims set forth herein.

Dated: ~~January~~ February 5, 2014                    Respectfully submitted,

By:   s/ Cliff Cantor
Cliff Cantor, WSBA # 17893
LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:    (425) 868-7813
Fax:    (425) 732-3752
Email: cliff.cantor@comcast.net

LEVI & KORSINSKY, LLP
Nicholas I. Porritt (*admitted pro hac vice*)
1101 30th St., Ste. 115
Washington, D.C. 20007
Tel:    (202) 524-4290
Fax:    (202) 333-2121

Attorneys for Plaintiff Jay Finkelstein

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 51 -
No. C11-1910 RSL

## VERIFICATION

I, Jay Finkelstein, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing amended shareholder derivative complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except as to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: February 3, 2014

_____
Jay Finkelstein